IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| FIRST SECURITY BANK, | ) )  |
| Plaintiff, | ) ) No._____ |
| v. | ) ) |
| CRAIG LYLE CAMPBELL AND KIM A. WEBSTER-CAMPBELL | ) ) ) |
| Defendants. | ) ) ) |

## COMPLAINT

First Security Bank ("**FSB**"), by and through its undersigned attorneys, files this complaint against Craig Lyle Campbell ("**Craig Campbell**") and Kim A. Webster-Campbell ("**Kim Campbell**," and together with Craig Campbell, the "**Campbells**"), and in support thereof, states as follows:

### I.

### NATURE OF THIS ACTION

In February 2008, FSB loaned $1,500,000 to the Campbells (the "**Loan**") and assigned to FSB as security for the Loan all right, title, and interest in a certain collateral account (the "**Collateral Account**") that contained cash and marketable securities, including those issued by InCapS Funding II, Ltd. (the "**InCapS Funding Securities**"). As additional security, they assigned FSB 77% of the aggregate interests in the Campbell Income Fund, L.P., an Illinois limited partnership (the "**Campbell Income Fund**"). Subsequently, in May 2011, FSB acquired the remaining 23% ownership interest in the Campbell Income Fund.

12D5910

1

The Campbells defaulted under the Loan and in September 2010, an Arkansas state court entered a default judgment against the Campbells in favor of FSB. The default judgment order required the Campbells to surrender to FSB the Collateral Account, including the InCapS Funding Securities, but the Campbells failed to comply with that order before filing their chapter 7 petition for relief on November 11, 2010.

On August 12, 2013, the chapter 7 trustee filed a motion to abandon the estate's interests in certain limited liability companies and securities, including the InCapS Funding Securities. The InCapS Funding Securities then had a market value of approximately $600,000 and were the only remaining liquid securities of value in the Collateral Account. The Collateral Account also contained $91,560.09 in cash, representing accrued quarterly dividends paid on the InCapS Funding Securities, with more dividends to be deposited thereafter.

Shortly after the filing of the abandonment motion, the Campbells set in motion a scheme that liquidated the InCapS Funding Securities and drained all cash from the Collateral Account for the Campbells' exclusive personal benefit, including the proceeds from the InCapS Funding Securities. The Campbells did this because they had been long been unemployed and they did not want to tap into the assets they claimed as exempt in their bankruptcy filing to cover their personal living expenses or pay for investments in a startup penny stock that they hoped would later employ Craig Campbell and make them both rich.

This complaint charges the Campbells with conversion, fraudulent concealment, and breach of fiduciary duty and seeks an accounting and recovery of funds that unjustly enriched them at the expense of FSB.

## II.

## JURISDICTION AND VENUE

1. This Court has original jurisdiction of this matter pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000 and because the citizenship of plaintiff and defendants are diverse from one another.

2. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to this action occurred in this district and because the Defendants reside in this district.

## III.

## PARTIES

3. Craig Lyle Campbell, a chapter 7 co-debtor in the above-captioned bankruptcy case, is an individual who resides in Lake Forest, Illinois.

4. Kim A. Webster-Campbell, a chapter 7 co-debtor in the above-captioned bankruptcy case, is the wife of Craig Campbell and resides in Lake Forest, Illinois.

5. First Security Bank is a State Bank duly organized and validly chartered under the laws of the State of Arkansas, with its principal place of business in the State of Arkansas and is a citizen of Arkansas for the purposes of federal diversity jurisdiction.

## IV.

## FACTUAL ALLEGATIONS

**A.    FSB's Interests in Campbell Income Fund.**

6. On or about February 29, 2008, FSB agreed to loan $1,500,000.00 to the Campbells (the "**Loan**").

7. The Loan was evidenced by a certain promissory note (the "**Note**") dated February 29, 2008, executed by the Campbells, jointly and severally, in favor of FSB in the principal amount of $1,500,000.00.

8. Pursuant to a certain Loan, Assignment and Security Agreement dated February 29, 2008, the Campbells' obligations under the Note were secured by a first priority security interest in an account at First Tennessee Bank, N.A., that contained certain assets of the Campbell Income Fund ("**Account No. 1**" or the "**Collateral Account**").

9. The assets in the Collateral Account included the InCapS Funding Securities, having a face value of $1,000,000.00 and representing collateralized debt obligations backed by a portfolio of insurance trust preferred securities issued by small to medium-sized U.S. community insurance companies.

10. At all relevant times, Campbell Capital Management, LLC ("Campbell Capital Mgmt.") was the general partner of the Campbell Income Fund.

11. Craig Campbell and Kim Campbell were the founders and co-managing members of Campbell Capital Mgmt.

12. As co-managing members of Campbell Capital Mgmt., the Campbells were jointly and severally responsible for the management of the day-to-day affairs of Campbell Capital Mgmt. and the Campbell Income Fund.

13. At the time of the Loan, the Campbells owned and controlled 77% of the Campbell Income Fund and a client of FSB owned the remaining 23% of the Campbell Income Fund.

14. At the time of the Loan, the Campbells assigned their 77% interest in the Campbell Income Fund to FSB as security for the Loan.

15. Subsequently, on May 27, 2011, FSB's client assigned its 23% ownership interest in the Campbell Income Fund to FSB.

16. At the time of the Loan, the Campbells also assigned the Collateral Account to FSB pursuant to a certain "Assignment of Investment Account as Collateral Agreement," including the "sole right of [FSB] to obtain possession of or collect … all … securities … which are credited and/or held in [the Collateral Account."

17. The Campbells defaulted on the Loan.

18. On June 23, 2010, FSB commenced an action on the Loan against the Campbells in the Circuit Court of Pulaski County, Arkansas, Case No. 60CV 2010-3431 (the "Arkansas State Court Action").

19. On September 15, 2010, a default judgment was entered against the Debtors in the Arkansas State Court Action in the principal amount of $1,142,991.67, plus accrued interest, costs, and fees (the "Judgment").

20. The Judgment provided that the Debtors shall surrender the Collateral Account to FSB, including the InCapS Funding Securities "or any proceeds of or rights thereto," but the Campbells failed to comply with that order before filing their chapter 7 petition for relief on November 11, 2010.

21. On September 6, 2013, this Court entered an order in this case (the "Abandonment Order") granting the Trustee's motion for authority to abandon interests in certain entities and securities, including the InCapS Funding Securities in the Collateral Account that had been directly assigned to FSB.

**B.      Craig Campbell begins to promote a private internet gaming venture, promising to capitalize it in hopes of having a significant equity position and managerial stake in the venture.**

22. Starting approximately one year before entry of the Abandonment Order, Craig Campbell started to promote an entity called Buoyant Concepts, Inc. ("Buoyant"), a small privately-held, undercapitalized company that was attempting to develop a game-oriented, internet-based platform called "Triple-Dibs."

23. Craig Campbell was introduced to Buoyant's chief executive officer in or around September 2012 by a mutual acquaintance.

24. He began spending significant time learning about Buoyant's business and assessing its financial needs.

25. He advised Buoyant's chief executive officer in 2012 that he was very interested in raising financing for Buoyant.

26. He represented to Buoyant's chief executive officer that he had the ability to provide initial seed money for Buoyant and to arrange the financing Buoyant needed to bring Buoyant's product to market.

27. He also told Buoyant's chief executive officer that his goal was to eventually own 25% of Buoyant's common stock and be co-chair of Buoyant's board of directors.

**C. Following entry of the Abandonment Order, the Campbells implement a scheme to deceive FSB and strip Campbell Income Fund of all cash and liquid securities for their personal benefit.**

28. In anticipation of the Abandonment Order's being entered, Craig Campbell requested on August 16, 2013 that FSB send him a settlement agreement that would "amicably conclude [the] financial relationship" with FSB, including "clos[ing] the fund [and] selling the securities."

29. On September 4, 2013, two days before entry of the Abandonment Order, FSB forwarded draft settlement agreements to the Campbells.

30. These draft agreements provided that Campbell Income Fund would transfer cash plus the InCapS Funding Securities in the Collateral Account to FSB.

31. After receiving these drafts, Craig Campbell communicated to FSB that an attorney was reviewing these drafts and would likely have comments.

32. In fact, however, no attorney was reviewing these drafts.

33. Craig Campbell lied about this to FSB solely to further the Campbells' scheme of siphoning cash and InCapS Funding Securities from the Collateral Account for their personal benefit.

34. Having received nothing back from the Campbells in the three weeks following its having forwarded the draft settlement agreements, FSB contacted Craig Campbell for a status update.

35. Craig Campbell responded that he was "still waiting" to hear back from the attorneys and "hopefully will hear soon."

36. In fact, however, no attorney was reviewing the drafts

37. Craig Campbell lied about this to FSB solely to further the Campbells' scheme of siphoning cash and InCapS Funding Securities from the Collateral Account for their personal benefit.

38. Approximately one week later, FSB again contacted Craig Campbell for a status regarding the Campbells' review of the draft settlement agreements.

39. Craig Campbell responded that they were "still fussing over some of the language."

40. In fact, however, the Campbells' had not even engaged an attorney to review the drafts.

41. Craig Campbell lied about this to FSB solely to further the Campbells' scheme of siphoning cash and the InCapS Funding Securities from the Collateral Account for the Campbells' personal benefit.

42. Craig Campbell lied about this to FSB solely to further Campbell's scheme of siphoning cash and the InCapS Funding Securities from the Collateral Account for the Campbells' personal benefit.

43. With approximately seven weeks having passed and the Campbells' still having not provided comments on the settlement agreement drafts, FSB advised Craig Campbell on October 24, 2013 that it wanted the InCapS Funding Securities in the Collateral Account turned over to FSB along with cash in the Collateral Account.

44. The InCapS Funding Securities then had a face value of $1 million and a market trading value of approximately $600,000.

45. Craig Campbell responded that he was "willing to conclude immediately."

46. In fact, however, unbeknownst to FSB, the Campbells were in the process on that same day of transferring the InCapS Funding Securities out of the Collateral Account into a Campbell Capital Mgmt. account that the Campbells, as co-managers of Campbell Capital Mgmt., controlled at Stifel, Nicolaus & Co., Inc. (the "Stifel Account").

47. Neither FSB nor the Campbell Income Fund had any interest in the Stifel Account.

48. Campbell Capital Mgmt. sold the InCapS Funding Securities from the Stifel Account as soon as the securities had been transferred in from the Collateral Account for $601,353.43.

49. When the trade settled one week later, on Thursday, October 31, 2013, the Campbells, as co-managers of Campbell Capital Mgmt., caused $600,000 of sale proceeds to be

transferred into another Campbell Capital Mgmt. account at Bridgeview Bank in which neither FSB nor the Campbell Income Fund had any interest.

50. On the following Monday, November 4, 2013, the Campbells, as co-managers of Campbell Capital Mgmt., caused $500,000 of the cash proceeds from the sale of the InCapS Funding Securities to be wire transferred to Buoyant.

51. The Campbells caused these funds to be transferred to Buoyant to fund their purchase of 2,500,000 shares of Buoyant common stock, representing an approximately 2.5% equity interest in Buoyant.

52. At the time the Campbells made the investment in Buoyant, they did not know how much cash Buoyant had on hand.

53. At the time the Campbells made the investment in Buoyant, they did not have current financial statements of Buoyant and did not review any current financial information of Buoyant.

54. At the time the Campbells made the investment in Buoyant, Buoyant's chief executive officer was subject to a "Consent Order of Prohibition" from the Illinois Secretary of State Securities Department that prohibited him from offering and selling securities in the State of Illinois.

55. When the Campbells concealed their intentions with respect to the disposition of the InCapS Funding Securities from FSB, they, as co-managers of the general partner of the Campbell Income Fund, owed a fiduciary duty to FSB as an owner of a 23% interest Campbell Income Fund.

56. Following the Campbells' $500,000 investment, Buoyant did not immediately issue a share certificate for the 2.5 million shares of common stock purchased because Buoyant's

chief executive officer was instructed by Craig Campbell not to immediately issue the share certificate.

57. Craig Campbell discussed the Campbells' plans with Buoyant's chief executive regarding the shares to be issued by Buoyant.

58. Craig Campbell advised that the Campbells were searching for the best way to diversify the shares and that they were in discussions with their advisors regarding what to do with those shares.

59. Craig Campbell advised Buoyant's chief executive officer that the source of the $500,000 investment was the Campbell Income Fund.

60. Craig Campbell advised Buoyant's chief executive officer that this Court was going to let the Campbells retain the money in the Campbell Income Fund through the Abandonment Order.

61. Craig Campbell said it was "nirvana" that he would the Campbells would be able to continue to control the money from the Campbell Income Fund.

62. Campbell advised Buoyant's chief executive officer at the time that there could be several different share certificates issued in respect of the $500,000 investment, but that the Campbells were not intending that the shares be issued to the Campbell Income Fund.

63. On several occasions after receiving the $500,000 investment, Buoyant's chief executive officer asked Craig Campbell to whom the share certificates should be issued.

64. Craig Campbell responded each time that a decision as to where or how those shares would be directed had not been made

12D5910　　　　　　　　　　　　　　　　　10

65. Buoyant's chief executive officer knew the money for the $500,000 investment in Buoyant had come from the Campbell Income Fund and he initially expected that the shares would be issued in the name of the Campbell Income Fund.

66. Craig Campbell, however, told Buoyant's chief executive officer on several occasions that the Campbells were looking at a wide spectrum of options.

67. Craig Campbell further advised Buoyant's chief executive officer that the share certificates might be issued to different trusts and that there were other possibilities regarding the share issuance that would provide protection for Kim Campbell and their children.

68. Craig Campbell told FSB on February 24, 2014 that he was a "founding member/shareholder" of Buoyant.

69. Craig Campbell became such a shareholder as a result of the $500,000 investment he made using funds misappropriated by the Campbells from the Collateral Account.

70. Despite owing FSB a fiduciary duty as co-managers of the general partner of the Campbell Income Fund, the Campbells never advised FSB at any time after the sale of the InCapS Funding Securities that these securities had been liquidated for the Campbells' personal benefit.

71. It was only in connection with the Bankruptcy Rule 2004 examination of Campbell in 2014 that FSB learned that Campbell had liquidated the InCapS Funding Securities for the Campbells' personal benefit.

72. The Campbells additionally diverted over $200,000 in cash and cash proceeds from the Collateral Account for their personal benefit.

73. The Campbells diverted these funds to bank accounts of Campbell Capital Mgmt. and to their own joint checking account to cover their living and other personal expenses.

## COUNT I

## (CONVERSION)

74. FSB incorporates and realleges paragraphs 1 through 73 of this Complaint as if fully set forth herein.

75. By the conduct alleged above, the Campbells wrongfully misappropriated and unlawfully diverted the InCapS Funding Securities and cash from the Collateral Account into accounts at different banks titled in the name of Campbell Capital Mgmt.

76. The Campbells, as co-managing members of Campbell Capital Mgmt., caused these assets to be subsequently diverted to their own personal accounts or for their own personal benefit.

77. FSB did not consent to the Campbells' improper misappropriation, diversion, use, or retention of the cash and InCapS Funding Securities that they diverted from the Collateral Account.

78. The cash and InCapS Funding Securities misappropriated and unlawfully diverted by the Campbells from the Collateral Account had a value in excess of $700,000.

79. The Campbells diverted cash and cash proceeds from the Collateral Account into their joint checking account for their personal use.

80. At all relevant times, the Campbells held no paying jobs and, except for the assets they declared as exempt in bankruptcy, had no other assets or sources of income from which they could pay their personal living expenses or make personal investments.

81. By converting the funds they misappropriated from the Collateral Account for their personal use, the Campbells avoided having to otherwise pay for these expenditures using assets they had declared as exempt in bankruptcy.

82. As a direct and proximate result of the Campbells' conduct, FSB suffered general and consequential damages in an amount to be proven at trial.

83. The aforementioned conduct was wanton and malicious and performed with willful and conscious disregard of FSB's rights and with the intent to deprive FSB of those rights. Accordingly, FSB is entitled to an award of punitive and exemplary damages against the Campbells in an amount to be proven at trial.

## COUNT II

## (FRAUDULENT CONCEALMENT)

84. FSB incorporates and realleges paragraphs 1 through 73 of this Complaint as if fully set forth herein.

85. At all relevant times, the Campbells, as co-managing members of Campbell Capital Mgmt., were in control of Campbell Income Fund and were responsible for the day-to-day management of Campbell Income Fund.

86. All activities of Campbell Capital Mgmt., the general partner of the Campbell Income Fund, were undertaken through and at the direction of the Campbells, as co-managing members of Campbell Capital Mgmt.

87. As holder of a 23% ownership interest in the Campbell Income Fund and assignee of the Collateral Account, FSB was owed a fiduciary duty by the Campbells on account of their being the co-managing members of Campbell Capital Mgmt., the general partner of the Campbell Income Fund.

88. In anticipation of the entry of the Abandonment Order, Craig Campbell advised FSB that the Campbells desired to "amicably conclude [the] financial relationship" with FSB, including "clos[ing] the fund [and] selling the securities."

89. Before and after entry of the Abandonment Order, Craig Campbell made numerous representations to FSB that were designed to lead FSB to believe that the Campbells, as co-managing members of the Campbell Income Fund's general partner, were safeguarding the assets in the Collateral Account for the benefit of FSB.

90. Through these statements and omissions, the Campbells concealed from FSB that they were intending to, and in fact did, siphon off the cash and InCapS Funding Securities from the Collateral Account for the Campbells' personal benefit.

91. FSB made reasonable inquiry of the Campbells regarding the status of the cash and InCapS Funding Securities in the Collateral Account and was consistently assured by Craig Campbell that these assets were being safeguarded for the benefit of FSB.

92. After being stonewalled and lied to for months regarding the status of the cash and InCapS Funding Securities in the Collateral Account, even after the Campbells had siphoned all these assets off for their personal benefit, FSB learned of the Campbells' misappropriation only after this Court compelled Craig Campbell's testimony and production of documents pursuant to Bankruptcy Rule 2004.

93. Had FSB learned of Campbell's intentions, it would acted differently by, among other things, applying to this Court for a temporary restraining order to prohibit the Campbells from draining the cash and InCapS Funding Securities from the Collateral Account for their personal benefit.

94. Instead FSB relied on the Campbells' misrepresentations and omissions that these assets were being safeguarded for the benefit of FSB.

95. As a direct and proximate result of the Campbells' fraudulent concealment, FSB has suffered general and consequential damages in an amount to be proven at trial.

96. The aforementioned conduct was wanton and malicious, and was performed with willful and conscious disregard of FSB's rights and with the intent to deprive FSB of those rights. Accordingly, FSB is entitled to an award of punitive and exemplary damages against the Campbells in an amount to be proven at trial.

## COUNT III

### (BREACH OF FIDUCIARY DUTY)

97. FSB incorporates and realleges paragraphs 1 through 73 of this Complaint as if fully set forth herein.

98. At all relevant times, the Campbells, as co-managing members of Campbell Capital Mgmt., were in control of Campbell Income Fund and were responsible for the day-to-day management of Campbell Income Fund.

99. All activities of Campbell Capital Mgmt., the general partner of the Campbell Income Fund, were undertaken through and at the direction of the Campbells, who were co-managing members of the Campbell Income Fund.

100. As the sole controlling persons over the day-to-day affairs of the Campbell Income Fund, the Campbells were in a position of superiority and influence at the Campbell Income Fund and they understood and accepted that there was repose of trust and confidence between themselves and FSB.

101. After May 27, 2011, FSB owned a 23% interest in the Campbell Income Fund and was assignee of the Collateral Account and the Campbells' 77% interest in the Campbell Income Fund.

102. The Campbells owed FSB a fiduciary duty of care, loyalty, and good faith.

103. During all relevant times, the Campbells held no paying jobs and, except for the assets they declared as exempt in bankruptcy, had no other assets or sources of income from which they could pay their personal living expenses or make personal investments.

104. The Campbells perpetuated their fraudulent scheme to drain the liquid assets from the Collateral Account for purposes of enhancing their personal wealth at the direct expense of FSB.

105. The Campbells siphoned off the cash and InCapS Funding Securities from the Collateral Account so they could avoid having to use assets they claimed as exempt in bankruptcy to cover their daily living expenses and make a personal investment in Buoyant.

106. The Campbells' actions were adverse to FSB and FSB derived no benefit from the Campbells' wrongful conduct.

107. As a direct and proximate result of the Campbells' breach of their fiduciary duties, FSB has suffered general and consequential damages in an amount to be proven at trial.

108. The aforementioned conduct was wanton and malicious, and was performed with willful and conscious disregard of FSB's rights and with the intent to deprive FSB of those rights. Accordingly, FSB is entitled to an award of punitive and exemplary damages in an amount to be proven at trial.

## COUNT IV

### (UNJUST ENRICHMENT)

109. FSB incorporates and realleges paragraphs 1 through 73 of this Complaint as if fully set forth herein.

110. The Campbells siphoned off the cash and liquid securities from the Collateral Account and, in so doing, conferred a direct benefit upon themselves.

111. The Campbells siphoned off the cash and InCapS Funding Securities from the Collateral Account.

112. The Campbells were aware that they were receiving benefits from the misappropriated funds and voluntarily accepted and retained those benefits so they would not have to use assets they claimed as exempt in bankruptcy to cover their daily living expenses and make a personal investment in Buoyant.

113. The Campbells were unjustly enriched as a direct and proximate result of their actions and did not provide any value or consideration to FSB in exchange for the assets they siphoned from the Collateral Account.

## COUNT V

### (ACCOUNTING)

114. FSB incorporates and realleges paragraphs 1 through 73 of this Complaint as if fully set forth herein.

115. The Campbells received at least $700,000 in direct benefits from the Campbell Income Fund.

116. All of the funds received by the Campbells were improperly transferred to or for their benefit as part of Campbells' fraudulent scheme.

117. The Campbells were knowing recipients of these fraudulently obtained funds.

118. The precise harm and monetary benefits to the Campbells, and the corresponding harm to FSB caused by their misconduct, is unknown to FSB and cannot be ascertained without a full accounting of all monies received by the Campbells.

119. FSB seeks a full accounting of all books, records, and finances of the Campbells and entities within their control so that FSB can determine the amount of monies fraudulently

transferred by the Campbells from the Collateral Account and the benefits obtained therefrom, including the extent to which they were able to avoid having to use assets they claimed as exempt in bankruptcy in order to cover their daily living expenses and to make the personal investment in Buoyant.

WHEREFORE, FSB requests that this Court:

A. Enter judgment in its favor and against Craig Campbell and Kim Campbell, jointly and severally, in an amount to be determined at trial;

B. Award punitive and exemplary damages against Craig Campbell and Kim Campbell, jointly and severally, in an amount to be proven at trial;

C. Order an equitable accounting of Craig Campbell and Kim Campbell, jointly and severally, setting forth: (1) any and all funds or property transferred to or for the benefit of the Campbells at any time from August 1, 2013 to the present from Craig Campbell, Kim Campbell, and/or from any individuals or entities affiliated with or controlled by them; (2) the current location of any such funds or property; and (3) the activity of any and all bank accounts held or controlled by Craig Campbell, Kim Campbell, or any individuals or entities affiliated with or controlled by them;

D. Impose a constructive trust over any and all assets of the Craig Campbell and Kim Campbell, jointly and severally, and any knowing recipients of such fraudulently transferred assets (including Campbells' attorneys), regardless of how such assets are held by them, and enjoin Craig Campbell and Kim Campbell, jointly and severally, from dissipating, assigning, or transferring any of their assets without authorization from this Court;

E. Enter an award in favor of the FSB for its reasonable attorneys' fees and costs; and

F. Provide such other and further relief as this Court may deem appropriate.

Dated: May 12, 2016 Respectfully submitted,

**FIRST SECURITY BANK**

By: /s/ Steve Jakubowski  One of Its
 Attorneys

Steve Jakubowski (ARDC No. 6191960) Robert J. Trizna (ARDC No. 3123760) Robbins, Salomon & Patt, Ltd.  180 N. LaSalle Street, Suite 3300 Chicago, Illinois 60601 Telephone:  (312) 456-0191 sjakubowski@rsplaw.com
rtrizna@rsplaw.com

*Attorneys for First Security Bank*